ANN BIRMINGHAM SCHEEL
Acting United States Attorney
District of Arizona

PAUL V. ROOD
Assistant United States Attorney
Arizona State Bar Number 004494
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile:  (602) 514-7662
E-mail: Paul.Rood@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>        v.<br><br>$64,382.17 in United States Currency,<br><br>              Defendant. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff, United States of America, through its attorneys, ANN BIRMINGHAM SCHEEL, Acting United States Attorney for the District of Arizona and Paul V. Rood, Assistant United States Attorney, bring this complaint and allege as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

**NATURE OF THE ACTION**

1.      This is a civil action *in rem,* seeking to forfeit to the United States proceeds or property traceable to such property involved in or attempted transaction relating to reporting on exporting and importing money instruments, subject to forfeiture pursuant to 31 U.S.C. § 5316.

2.      This is a civil action *in rem,* seeking to forfeit to the United States proceeds or property traceable to such property involved in or attempted transaction relating to money laundering, subject to forfeiture pursuant to 18 U.S.C. § 1956.

3. This is a civil action *in rem,* seeking to forfeit to the United States proceeds or property traceable to such property involved in or attempted transaction relating to bulk cash smuggling into or out of the United States, subject to forfeiture pursuant to 31 U.S.C. § 5332, and therefore, forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

4. This is a civil action *in rem*, seeking to forfeit to the United States proceeds or personal property purchased and acquired with proceeds from a specified unlawful activity as defined in Title 18 U.S.C. Section 1956 (c)(7) and (A) and, therefore forfeitable pursuant to Title 18 United States Code Section 981(a)(1)(C).

## THE DEFENDANT *IN REM*

5. The Defendant consists of $64,382.17 in United States currency ("defendant currency"), seized on September 6, 2010, from Victor Hugo Orbegoso. The defendant currency is currently in the custody of the United States Customs and Border Protection.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

7. This Court will have *in rem* jurisdiction over the defendant currency upon the Court's issuance of an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), and the execution of said arrest warrant on the defendant currency pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

8. Venue is proper in this district:
   a) pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district; and
   b) pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b), because the defendant currency was found in this district.

## FACTS

10. On or about September 6, 2010, at approximately 2:13 p.m., Arizona Department of Public Safety Officer Heath Goodman stopped Victor Hugo Orbegoso

2

("ORBEGOSO") on Interstate 10 at mile marker 162 in Chandler, Arizona, adjacent to the Wild Horse Pass exit for exceeding the posted speed limit. ORBEGOSO was traveling at eighty miles per hour in a sixty-five mile per hour zone.

11. Officer Goodman noted ORBEGOSO would not make eye contact and observed ORBEGOSO's hands began to shake. ORBEGOSO looked numerous times at a black backpack located on the floor by the front passenger seat.

12. Officer Goodman asked ORBEGOSO to exit the vehicle. ORBEGOSO attempted to cover the black backpack with numerous papers located in the interior of the vehicle.

13. ORBEGOSO was issued a warning for excessive speed. After issuing the warning, Officer Goodman asked ORBEGOSO for consent to search the vehicle. ORBEGOSO consented to the search.

14. During the search of the vehicle, Officer Goodman located the black nylon backpack in the front passenger seat of the vehicle. While searching the backpack, Officer Goodman located a large amount of U.S. currency, stacked and wrapped in organized bundles with rubber bands around them.

15. Officer Goodman also located a large stack of ATM receipts, a laptop and a computer hard drive in the backpack.

16. ORBEGOSO informed Officer Goodman that he had a large amount of currency with him because he owned a business.

17. ORBEGOSO was transported to the Arizona Department of Public Safety Substation located at 2600 South 16th Street, Phoenix, Arizona, by Officer Goodman.

18. Officer Goodman contacted Arizona Department of Public Safety Detective Brady Wilkins to assist with the investigation. United States Department of Homeland Security, Immigration and Customs Enforcement Task Force Officer ("TFO") Jay Fawcett also assisted with the investigation.

**Canine Examination**

19. On September 14, 2011, at approximately 3:40 p.m., Mesa Police Department Detective Christopher Knight ("Detective Knight"), utilized his Certified Narcotics Detection canine "Apollo" to conduct an examination of the ORBEGOSO's black nylon backpack and the $64,382.17 in U.S. currency.

20. Apollo is trained and certified to detect the odors of marijuana, cocaine, heroin and methamphetamine.

21. Apollo is currently certified with the National Police Canine Association (NPCA). If at any time during the examination Apollo smells one of the four odors he is trained to detect, Apollo will alert by sitting at the area where he smells the odor.

22. Prior to using Apollo to conduct a sniff of the backpack, Detective Knight conducted an initial inspection by allowing Apollo to examine a room at the substation for any odor of illegal drugs.

23. Both, the currency and the backpack were placed in separate areas of the room. Apollo was brought into the same room that had been cleared by Detective Knight.

24. Apollo was given the command to sniff.

25. Upon reaching the backpack and U.S. currency, Apollo alerted to the presence of one of the odors he is trained to detect.

26. Detective Knight informed Detective Fawcett of Apollo's positive alert.

27. TFO Fawcett conducted a records check, which revealed ORBEGOSO had crossed into the United States at the Douglas Port of Entry at 10:43 a.m. (MST) earlier that day on September 6, 2010, in a 2007 Lexus ES 350. ORBEGOSO was the only occupant of the vehicle at the Port of Entry.

28. TFO Fawcett accessed a map database to calculate the number of miles and time required to travel between the Douglas Port of Entry and the site of the traffic stop. The database revealed the distance between the Douglas Port of Entry and the traffic stop was 216

miles. The trip would take three hours and forty-two minutes to complete while traveling at the posted speed limit.

29. Investigators advised ORBEGOSO the currency would be seized due to the circumstances surrounding the transportation of the cash.

30. ORBEGOSO was advised of his Miranda Rights. ORBEGOSO waived his right to remain silent and his right to counsel.

31. ORBEGOSO informed investigators he was employed as a manager with PSI Group in Phoenix, Arizona.

32. ORBEGOSO claimed his income for 2009 was approximately $130,000.00.

33. ORBEGOSO informed investigators the money in the backpack was his money and he was bringing it home to Arizona from Mexico.

34. ORBEGOSO informed investigators he traveled to Mexico on September 4, 2010 and returned on September 6, 2010.

35. ORBEGOSO stated during his time in Mexico, he made multiple ATM withdrawals from his numerous bank accounts and withdrew cash in Mexican pesos, which he exchanged at a "currency exchange" for U.S. currency by exploiting the currency exchange market to make a profit on his withdrawals, and exchanged the pesos back into U.S. dollars.

36. ORBEGOSO claimed his profit margin varied between .5 and 5 percent. During the weekend of September 4, 2010 through September 6, 2010, ORBEGOSO received 12.8 pesos for every U.S. dollar. ORBEGOSO claimed he made a profit of approximately .5 pesos for every U.S. dollar exchanged.

37. ORBEGOSO stated when he crossed into the United States at the Port of Entry in Douglas, Arizona, he was in possession of $64,378.00 in U.S. dollars and did not declare any currency upon entering the United States at the Douglas Port of Entry.

38. Upon further questioning, ORBEGOSO claimed he had knowledge of the $10,000.00 U.S. Currency Transaction Reporting ("CTR") requirement from prior international travel.

5

39. ORBEGOSO stated he had knowledge of making declarations regarding transporting currency out of the United States into Mexico.

40. ORBEGOSO informed investigators he was stopped by U.S. Customs and Border Protection ("CBP") Officers in the past prior to leaving the United States.

41. ORBEGOSO stated his prior encounters with CBP were regarding outbound bulk cash inspections and making declarations regarding currency.

42. ORBEGOSO claimed he was afraid the currency in his possession was going to appear to be from money laundering operations.

43. ORBEGOSO informed investigators he traveled to Agua Prieta, Mexico, twice a week to conduct ATM withdrawals and subsequent currency exchanges in Mexico by converting Mexican pesos into U.S. dollars.

44. ORBEGOSO stated he had never declared the currency which he brought through the United States Port of Entry.

45. ORBEGOSO claimed he had been making currency exchanges since September 2009.

46. Investigators conducted a records check and found ORBEGOSO had never filed a Currency or Monetary Instrument Report ("CMIR") at a Port of Entry and had never declared any of his bulk currency when crossing at the Port of Entry.

47. ORBEGOSO stated he held bank accounts at nine different banks in Arizona: Seventeen at Wells Fargo Bank; Ten at Compass Bank; and, an unknown number of accounts at seven other banks.

48. ORBEGOSO stated he made deposits under $10,000.00 in U.S. currency at all nine banks.

49. ORBEGOSO informed investigators he made multiple deposits into numerous accounts to facilitate making numerous withdrawals in Agua Prieta via ATM so he could maximize the amounts he could withdraw via ATM.

50. ORBEGOSO stated he made the majority of the deposits and also directed his daughter, Meghan, to make deposits for him.

51. ORBEGOSO stated he had knowledge of the Cash Transaction Report (CTR) requirement and made deposits of currency in each account in increments under $10,000.00.

52. ORBEGOSO made multiple deposits into separate accounts in one day to avoid the CTRs.

53. ORBEGOSO also had not completed any corporate filings or registered as a money service business (MSB) as of September 6, 2010.

54. ORBEGOSO claimed he had been in the process of obtaining a United States Tax Identification Number, however, did not claim his profit from the currency exchange as income with the Internal Revenue Service.

55. ORBEGOSO stated he planned on forming a limited liability company, which he would name MADG. ORBEGOSO informed investigators MADG stood for the first letters of the name of his children.

56. ORBEGOSO claimed he worked with a business planner by the name of Mark Warner, 3127 East Hobart Street, Gilbert, Arizona, to complete the business filings for his business.

57. ORBEGOSO stated he planned on building a business to ship containers of goods to South America, primarily Peru.

58. During the weekend of September 4, 2010, ORBEGOSO claimed he made a profit of approximately $2,000.00.

59. ORBEGOSO claimed he made a profit of approximately $4,000.00 per week after making two trips in one week from Arizona to Mexico.

60. ORBEGOSO claimed that evidence of his currency exchange business was documented on his computer.

61. ORBEGOSO denied any involvement in money laundering or drug trafficking.

62. ORBEGOSO stated in 2004, there was an incident where members of his extended family were arrested for trafficking cocaine, however, he denied any involvement.

63. ORBEGOSO stated he was present when members of his extended family were arrested at his residence.

64. ORBEGOSO was in possession of ninety-four ATM receipts from withdrawals he made in Mexico between September 4, 2010 and September 6, 2010. Twenty-three of the receipts were from Banco Santander, thirty-two were from BBVA Bancomer, twenty-three were from HSBC Mexico and sixteen were from Banamex.

65. An analysis of the ATM slips revealed a total of $2,472.86 in Mexican pesos charged as transaction fees by the Mexican banks.

66. The total amount withdrawn from ATMs in Mexico, including transaction fees equaled 784,000 Mexican pesos.

67. The following is a table of ATM withdrawals made between September 4, 2010 and September 6, 2010:

| Date of Withdrawal | Time of Withdrawal | Number of ATM Withdrawals |
|---|---|---|
| 09/04/2010 | 2:18 p.m. – 7:00 p.m. | 48 |
| 09/05/2010 | 3:40 p.m. – 4:17 p.m. | 30 |
| 09/06/2010 | 10:35 a.m. – 10:48 a.m. | 16 |
| | | 94 Total ATM Withdrawals |

68. According to the United States Port of Entry records, ORBEGOSO crossed into Agua Prieta on September 4, 2010, at 3:38 p.m., after twenty-eight ATM withdrawals.

69. ORBEGOSO crossed back into the United States at the Port of Entry on September 6, 2010.

70. Six ATM withdrawals were made in Agua Prieta, Mexico after ORBEGOSO crossed back into the United States at the Douglas Port of Entry on September 6, 2010, at 10:43 a.m.

71. The other ten ATM withdrawals were made between 10:35 a.m. and 10:42 a.m.

72. ORBEGOSO had in his possession all of the ATM receipts for the listed ATM withdrawals.

73. Investigator's analysis of the bank information revealed the average cost to the consumer for the listed ATM transactions was $15.00 per transaction, which included the fees from the Mexican banks and the U.S. banks. The approximate cost for the ninety-four ATM transactions totaled $1,410.00. There was only one receipt from a Mexico-based currency exchange that listed business information. The additional receipts ORBEGOSO claimed were from Mexico currency exchange businesses and were merely adding machine slips with handwritten dates on them.

74. ORBEGOSO informed investigators he was married to Francisca Carrillo Martan Carrillo Martan ("Carrillo Martan") and that she resided in Agua Prieta, Sonora, Mexico, along with their two children.

75. ORBEGOSO stated he had three other children who resided with his ex-wife in Arizona.

76. ORBEGOSO stated his daughter, Meghan Orbegoso, is currently a student at the University of Arizona in Tucson, Arizona.

77. ORBEGOSO informed investigators he leaves the majority of his numerous debit cards with his wife Carrillo Martan in Agua Prieta, Mexico.

78. When asked if he was transporting U.S. currency across the United States/Mexico border at the request of someone else, ORBEGOSO stated, "No."

79. At approximately 5:04 p.m., investigators informed ORBEGOSO the currency in his possession would be seized.

80. Investigators also seized ORBEGOSO's black backpack and the items contained in the backpack, which consisted of: a Dell Latitude D830 laptop computer with Serial Number 207565; Seagate "Free Agent" model portable hard drive with Serial Number

2GE1XPYO; Kingston portable thumb drive with Serial Number CN092207; Kingmax 64 MB micro SD data card; Hasp brand computer dongle; black notebook with financial ledgers listed inside; miscellaneous receipts and ATM receipts; two safety deposit box keys; and, one grey colored watch.

81. While removing the currency from the backpack, investigators found an additional bundle of U.S. currency located in a separate zippered pouch of the bag. The currency was in varied denominations and totaled $2,378.00. A "Post-It" note was discovered inside the backpack, which listed the $2,378.00 and a total of $64,378.00. The currency located in the backpack totaled $62,000.00. Loose change in U.S. currency was located in the backpack, which totaled $4.17. The total amount of U.S. currency in the backpack totaled $64,382.17. This amount was seized and placed into evidence.

82. ORBEGOSO left the Arizona Department of Public Safety substation at the conclusion of the interview and was given contact information for investigators and a receipt for the seized property.

### Interview of Orbegoso

83. On or about September 20, 2010, ORBEGOSO met with investigators at the Phoenix Immigration and Customs Enforcement (ICE) Office located at 3010 North 2nd Street, Phoenix, Arizona. ORBEGOSO picked up the property seized from him on September 6, 2010. The U.S. Currency was not returned to him.

84. While at the ICE Office, ORBEGOSO provided investigators with a copy of his 2009 Tax Returns, both Federal and Arizona State, with copies of his September 2010 bank statements pertaining to his Wells Fargo and Compass Bank accounts. ORBEGOSO.

85. Investigators asked ORBEGOSO for clarification concerning some of the ATM receipts that were in ORBEGOSO's possession on September 6, 2010. Specifically 28 ATM withdrawals made before he entered Mexico on September 4, 2010.

86. ORBEGOSO stated his wife, Carrillo Martan, made the withdrawals prior to his arrival in Mexico.

87. ORBEGOSO stated his wife, Carrillo Martan, assisted him with making the withdrawals between September 4, 2010 and September 6, 2010. ORBEGOSO, however, had previously informed investigators when he was interviewed on September 6, 2010, that his wife Carrillo Martan did not make ATM withdrawals for him, that she only held the cards for him. ORBEGOSO also stated no one else made the ATM withdrawals.

88. Even though time stamps on some of the ATM transactions were after OBREGOSA has entered the United States from Mexico, ORBEGOSO stated he made all the ATM withdrawals on September 6, 2010 and exchanged the Mexican pesos into U.S. currency prior to crossing back into the United States at 10:43 a.m.

89. ORBEGOSO again claimed he made a profit from the Pesos exchange and stated he averaged $4,000.00 to $6,000.00 per month profit.

90. When asked if he claimed any of the profit from his currency exchange transactions on his tax returns as income, ORBEGOSO stated was that he was working with an accountant named Mark Warner.

91. ORBEGOSO told investigators that Mark Warner instructed him to make deposits in increments of under $10,000.00 so the transactions would not be reported to the Internal Revenue Service.

92. According to Arizona Corporation Commission records, on September 13, 2010, ORBEGOSO filed the Articles of Organization forming a limited liability company ("LLC") in the name of MADG, LLC.

93. Mark Warner, 3127 East Hobart, Gilbert, Arizona, is listed as the statutory agent for MADG, LLC, and Victor ORBEGOSO listed as manager. The type of business was not listed.

94. A website pertaining to an accounting firm in the name of Warner and Warner Accountants was located.

95. ORBEGOSO's income listed on the 2009 Tax Return is supported by a W2 from PSI Group, which listed ORBEGOSO's total income for 2009 as $112,741.00.

11

96. ORBEGOSO listed his wife on his 2009 Tax Return with a Social Security Number XXX-XX-6892.

97. His wife was previously issued a B1/B2 Visa under A#XXXXX9393, however, she was not issued a Social Security Number.

98. On or about May 2, 2008, ORBEGOSO's wife, Carrillo Martan, was removed from the United States for fraudulently attempting to change her Visa status. She currently does not hold a valid Visa.

### Criminal History

99. On or about January 30, 2004, after receiving information of the delivery of a large quantity of cocaine, Chandler Police Department Narcotics and Conspiracy, conducted surveillance and obtained a search warrant for 5310 North 33rd Drive, #C, Phoenix, Arizona. The warrant netted fifty four kilos of cocaine. ORBEGOSO resided at this residence, which he shared with his girlfriend Carrillo Martan and at least three other individuals. ORBEGOSO stated he had no knowledge of the cocaine or narcotic related items at the residence. Ana Robinson, one of the individuals who resided at the residence was arrested.

### Demand/Source Relationship

100. A demand/source relationship exists between Mexico and Phoenix, Arizona regarding the distribution of illegal drugs. Due to its close proximity to the United States/Mexico border, Phoenix is a supply location regarding the distribution of illegal drugs throughout the United States. Investigators seized $64,382.17 from ORBEGOSO.

/ / /

/ / /

The following represents a breakdown of the currency seized from ORBEGOSO:

| Number of Bills | Denomination | Amount |
|---|---|---|
| 354 | $ 100.00 | $35,400.00 |
| 38 | $ 50.00 | $ 1,900.00 |
| 1352 | $ 20.00 | $27,040.00 |
| 3 | $ 10.00 | $ 30.00 |
| 1 | $ 5.00 | $ 5.00 |
| 3 | $ 1.00 | $ 3.00 |
| **Total:** | | **$64,378.00** |

### FIRST CLAIM FOR RELIEF

Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 100 above. Based on the aforementioned facts and circumstances, the defendant currency is subject to forfeiture pursuant to 31 U.S.C. § 5316, because it was proceeds or property traceable to such property involved in or attempted transaction relating to reporting on exporting and importing money instruments, subject to forfeiture.

### SECOND CLAIM FOR RELIEF

Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 100 above. The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 1956, because it was proceeds or property traceable to such property involved in or attempted transaction relating to money laundering.

### THIRD CLAIM FOR RELIEF

Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 100 above. The defendant currency is subject to forfeiture pursuant to 31 U.S.C. § 5332, and therefore, forfeitable pursuant to 18 U.S.C. § 981(a)1)(A), because it was proceeds or property traceable to such property involved in or attempted transaction relating to bulk cash smuggling into or out of the United States.

**FOURTH CLAIM FOR RELIEF**

Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 100 above. The defendant currency is subject to forfeiture pursuant to Title 18 U.S.C. Section 1956 (c)(7) and (A) and, therefore forfeitable pursuant to Title 18 United States Code Section 981(a)(1)(C), because it was proceeds or personal property purchased and acquired with proceeds from a specified unlawful activity.

DATED this 3rd day of January, 2011.

          ANN BIRMINGHAM SCHEEL
          Acting United States Attorney
          District of Arizona

          *S/ Paul V. Rood*

          PAUL V. ROOD
          Assistant United States Attorney